## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

|  |  |  |  |
|---|---|---|---|
| IN RE: | ) | CHAPTER | 11 |
|  | ) |  |  |
| O.W. BUNKER HOLDING NORTH AMERICA INC., *et al.*, | ) | CASE No. | 14-51720 (JAM) |
|  | ) |  |  |
| DEBTORS. | ) | ECF Nos. | 1530 and 1534 |

### APPEARANCES

Eric Henzy, Esq.
Zeisler & Zeisler, P.C.
10 Middle Street
Bridgeport, CT 06605

Michael R. Enright, Esq.
Patrick M. Birney, Esq.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

Michael M. Parker, Esq.
Steve A. Peirce, Esq.
Norton Rose Fulbright US LLP
300 Convent Street, Suite 2200
San Antonio, Texas 78205

Natalie D. Ramsey, Esq
Davis Lee Wright, Esq.
Robinson & Cole LLP
1000 N. West Street
Wilmington, DE 19801

Attorneys for Nustar Energy Services, Inc.
and Nustar Terminals Marine Services N.V.

Attorneys for O.W. Bunker USA Inc.
Liquidating Trust and O.W. Bunker USA

### MEMORANDUM OF DECISION: (i) GRANTING IN PART AND DENYING IN PART NUSTAR'S MOTION FOR SUMMARY JUDGMENT; AND (ii) DENYING IN PART AND GRANTING IN PART OWB USA TRUST'S MOTION FOR SUMMARY JUDGMENT

### I.  Introduction

On November 13, 2014, O.W. Bunker Holding North America Inc. ("OWB Holding"),

O.W. Bunker North America Inc. ("OWB NA"), and O.W. Bunker USA, Inc.[1] ("OWB USA"),

filed petitions for relief under Chapter 11 of the Bankruptcy Code.  At the time of the filing of

---

[1] OWB USA's corporate parent is O.W. Bunker A/S, a corporation organized under the laws of the Denmark. Declaration of Hamish Allanson in Support of the OWB USA Motion for Summary Judgment ¶ 4 (the "Allanson Decl.," ECF No. 1536).

the petitions, OWB NA and OWB USA conducted the United States operations of an international group of global marine fuel companies (collectively, the "OW Bunker Group") which provided fuel oil (the "bunkers" or "bunker fuel") to marine vessels. *See* Debtors' Joint Disclosure Statement with Respect to Debtors' Liquidation Plans (ECF No. 1018).

On December 15, 2015, the Court entered an Order Confirming the Debtors' First Modified Liquidation Plans and Kelly Beaudin Stapleton was appointed as the Liquidating Trustee of the OWB NA Liquidating Trust (the "OWB NA Trust") and the OWB USA Liquidating Trust (the "OWB USA Trust"). Prior to the confirmation of the Debtors' First Modified Liquidation Plans, NuStar Energy Services, Inc. ("NuStar Services") filed a proof of claim against OWB USA, asserting it is entitled to an allowed priority administrative expense claim of $6,476,246.17 pursuant to 11 U.S.C. § 503(b)(9).[2] NuStar Terminals Marine Services N.V. ("NuStar Terminals," together with NuStar Services, "NuStar") also filed a proof of claim against OWB USA, asserting it is entitled to an allowed priority administrative expense claim of $2,456,997.27 pursuant to section 503(b)(9). On August 20, 2015, the Debtors objected to NuStar's Proofs of Claim (the "Debtors' Objection to Claims 5 and 6," ECF No. 53).

NuStar's administrative expense claims are the subject of two motions for summary judgment; the first filed by NuStar and the second by OWB USA Trust.[3] NuStar claims that NuStar Services and NuStar Terminals are entitled, as a matter of law, to administrative expense claims for delivery of bunker fuel to the thirteen marine vessels defined below (collectively, the "Vessels").[4] The OWB USA Trust objects to NuStar's assertion, and claims, as a matter of law,

---

[2] All references to the "Bankruptcy Code," "section," or "§" refer to Title 11 of the United States Code, 11 U.S.C. § *et seq.*, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 ("BAPCPA").
[3] The "NuStar MSJ," (ECF No. 1530) and the "OWB USA MSJ," (ECF No. 1534). The NuStar MSJ and the OWB USA MSJ are collectively referred to as the "Motions for Summary Judgment".
[4] The Vessels are also referred to with the term "Vessel Interests." *See, e.g.*, NuStar-OWB USA Stipulation, 5 n.16 (ECF No. 1523).

that the Debtors did not receive the bunker fuel and therefore NuStar Services' and NuStar Terminals' administrative expense claims should be recharacterized as general unsecured claims. NuStar and the OWB USA Trust submitted an extensive joint stipulation of facts with respect to the Motions for Summary Judgment.[5]  NuStar and the OWB USA Trust assert that the only disputed issue to be decided is whether the bunker fuel was "received by" OWB USA.

The purchase and delivery of the bunker fuel was accomplished through multiple parties and governed by several contracts.  When the Vessels ordered bunker fuel, OWB USA ultimately fulfilled those orders by contracting with NuStar to deliver the bunker fuel to the Vessels.  In the contracts between the OW Bunker Group and the Vessels, the OW Bunker Group was the "Seller" and each Vessel was the "Buyer."[6]  In the contracts between NuStar and OWB USA, NuStar was the "Seller" and OWB USA was the "Buyer."[7]

The parties have not presented, and the Court has not found, controlling case law specifically addressing the issue of "receipt" by a debtor in circumstances such as those presented in this case.  The Motions for Summary Judgment focus on the issues of transfer of title, risk of loss, and delivery of the bunker fuel at each Vessel flange to determine whether OWB USA "received" the bunker fuel.  However, addressing those issues does not answer the question of whether NuStar is entitled to an administrative expense claim.  The Court must instead focus on the

---

[5] See ECF No. 1523 (the "NuStar-OWB USA Stipulation"); see also ECF No. 1531 (the "NuStar Supplement to ECF No. 1523"); ECF No. 1537 (the "OWB USA Trust's Supplement to ECF No. 1523"); ECF No. 1557 (the "NuStar Second Supplement to ECF No. 1523"); and ECF No. 1564 (the "OWB USA Trust's Statement in Opposition to the NuStar Supplement to ECF No. 1523," which does not address the NuStar Second Supplement).

[6] The OW Bunker Group Terms and Conditions of sale for Marine Bunkers, Edition 2013 (the "OW Bunker Group Terms"), applied to the contracts between the OW Bunker Group, which includes OWB USA, and the entity purchasing bunker fuel from the OW Bunker Group.  Id. at ¶ 12 and attached as Exhibit SF-26.  The parties define the OW Bunker Terms as the OWB USA GTCs. The Court believes that the term OWB USA GTCs could be interpreted to apply only to OWB USA, which it does not, and therefore will refer throughout this decision to the OW Bunker Group Terms and Condition of sale of Marine Bunkers, Edition 2013, as the OW Bunker Group Terms.

[7] The NuStar Services and NuStar Terminals General Terms and Conditions ("NuStar GTCs"), applied to, and governed the NuStar-OWB USA Vessel Fuel Contracts between NuStar Services and NuStar Terminals and OWB USA, respectively.  Id. at ¶ 11.  The NuStar GTCs are attached to the NuStar-OWB USA Stipulation as Exhibit SF-29 and SF-32.

case law addressing the definition of "receipt" under section 503(b)(9) and the contracts between the OW Bunker Group and the Vessels in order to determine whether OWB USA "received" the bunker fuel.

## II.    Undisputed Facts

### The OW Bunker Group Transactions with the Vessels and the NuStar Transactions with the Vessels[8]

The parties agree that NuStar Services delivered bunker fuel to twelve vessels pursuant to its contracts with OWB USA, and that NuStar Terminals delivered bunker fuel to one vessel pursuant to its contract with OWB USA.  NuStar and OWB USA also agree that the bunker fuel supplied by NuStar Services and NuStar Terminals constituted "goods" within the meaning of § 503(b)(9). NuStar and OWB USA further agree that each delivery of bunker fuel occurred within the twenty day period before the petition date and that OWB USA never had physical possession of the bunker fuel that is the subject of NuStar's alleged administrative expense claims.  The facts surrounding the delivery of the bunker fuel to each Vessel, along with the amount of NuStar's alleged administrative expense claims, are detailed below.

### 1.    The "Navegantes Express" – Alleged Claim for $651,752.94

The Navegantes Express initially ordered bunker fuel from Hapag-Lloyd Aktiengesellschaft ("Hapag-Lloyd"), which ordered bunker fuel from OW Germany GMBH ("OW Germany"), which then ordered from OWB USA.[9]  On October 13, 2014, OWB USA entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the Navegantes Express.[10]  On October 25, 2014, NuStar Services delivered the bunker fuel to the Navegantes Express.[11]  On November 4, 2014, NuStar Services sent an invoice and the Marine

---

[8] *See generally*, NuStar-OWB USA Stipulation, 14 at Table 2; ¶¶ 47-81.
[9] NuStar-OWB USA Stipulation, ¶ 48.
[10] *Id.*; *see id.* at Ex. SF-1.
[11] *Id.* at ¶ 48.

Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[12]

### 2. The "Wellington Express" – Alleged Claim for $628,868.79

The Wellington Express initially ordered bunker fuel from Hapag-Lloyd, which ordered bunker fuel from OW Germany, which then ordered from OWB USA.[13] On October 13, 2014, OWB USA entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the Wellington Express.[14] On October 26, 2014, NuStar Services delivered the bunker fuel to the Wellington Express.[15] On November 4, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[16]

### 3. The "COSCO Haifa" – Alleged Claim for $795,650.68

The COSCO Haifa initially ordered bunker fuel from COSCO Petroleum Ptd Ltd. ("COSCO Petroleum"), which ordered bunker fuel from Chimbusco Americas, Inc., which ordered bunker fuel from O.W. Bunker Far East ("OW Far East"), which then ordered from OWB USA.[17] On October 28, 2014, OWB USA entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the COSCO Haifa.[18] On November 1, 2014, NuStar Services delivered the bunker fuel to the COSCO Haifa.[19] On November 10, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[20]

---

[12] *Id.* at ¶ 50; *see id.* at Ex. SF-3.
[13] *Id.* at ¶ 49.
[14] *Id.*; *see id.* at Ex. SF-2.
[15] *Id.* ¶ 49.
[16] *Id.* at ¶ 50; *see id.* at Ex. SF-4.
[17] *Id.* at ¶ 52.
[18] *Id.*; *see id.* at Ex. SF-5.
[19] *Id.* at ¶ 52.
[20] *Id.* at ¶ 54; *see id.* at Ex. SF-7.

#### 4. The "COSCO Venice" – Alleged Claim for $790,701.48

The COSCO Venice initially ordered bunker fuel from COSCO Petroleum, which ordered bunker fuel from Chimbusco Americas, Inc., which ordered bunker fuel from OW Far East, which then ordered from OWB USA.[21]  On October 21, 2014, OWB USA entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the COSCO Venice.[22]  On October 27, 2014, NuStar Services delivered the bunker fuel to the COSCO Venice.[23]  On November 5, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[24]

#### 5. The "Norwegian Jewel" – Alleged Claim for $890,855.27

The Vessel Interests for the Norwegian Jewel ordered bunker fuel from OWB USA on October 20, 2014.[25]  OWB USA entered into a contract with NuStar Services to have NuStar Services deliver the bunker fuel to the Norwegian Jewel.[26]  On October 25, 2014, NuStar Services delivered the bunker fuel to the Norwegian Jewel.[27]  On November 5, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[28]

#### 6. The "Hellas Glory" – Alleged Claim for $905,696.22

The Hellas Glory ordered bunker fuel from OW Swiss, which then ordered from OWB USA.[29]  On October 14, 2014, OWB USA entered into a contract with NuStar Services to have

---

[21] *Id.* at ¶ 53.
[22] *Id.*; *see id.* at Ex. SF-6.
[23] *Id.* at ¶ 53.
[24] *Id.* at ¶ 54; *see id.* at Ex. SF-8.
[25] *Id.* at ¶ 56.
[26] *Id.*; *see id.* at Ex. SF-9.
[27] *Id.* at ¶ 56.
[28] *Id.* at ¶ 57; *see id.* at Ex. SF-10.
[29] *Id.* at ¶ 59.

NuStar Services deliver bunker fuel to the Hellas Glory.[30]  On October 26, 2014, NuStar Services delivered the bunker fuel to the Hellas Glory.[31]  On November 5, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[32]

### 7. The "Global Leader" – Alleged Claim for $512,557.31

The Global Leader ordered bunker fuel from NYK Trading Corp. o/b/o Nippon Kaisha Line, Ltd. ("NYK Trading"), which then ordered from OWB USA.[33]  On October 21, 2014, OWB USA entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the Global Leader.[34]  On October 25, 2014, NuStar Services delivered the bunker fuel to the Global Leader through a Chemoil Charter service.[35]  On November 7, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[36]

### 8. The "Waregem" – Alleged Claim for $520,571.54

The Waregem ordered bunker fuel from OWB USA, and on November 5, 2014, OWB USA entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the Waregem.[37]  On November 6, 2014, NuStar Services delivered the bunker fuel to the Waregem.[38]  On November 10, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[39]

---

[30] *Id.*; *see id.* at SF-11.
[31] *Id.* at ¶ 59.
[32] *Id.* at ¶ 60; *see id.* at Ex. SF-12.
[33] *Id.* at ¶ 62.
[34] *Id.*; *see id.* at Ex. SF-13.
[35] *Id.* at ¶ 62.
[36] *Id.* at ¶ 63; *see id.* at Ex. SF-14.
[37] *Id.* at ¶ 65; *see id.* at Ex. SF-15.
[38] *Id.* at ¶ 65.
[39] *Id.* at ¶ 66; *see id.* at Ex. SF-16.

### 9. The "Elka Angelique" – Alleged Claim for $261,449.45

The Elka Angelique ordered bunker fuel from OW UK, which then ordered from OWB USA.[40] On October 21, 2014, OWB USA entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the Elka Angelique.[41] On October 27, 2014, NuStar Services delivered the bunker fuel to the Elka Angelique.[42] On October 30, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[43]

### 10. The "Jo Ilex" – Alleged Claim for $267,664.11

The Jo Ilex ordered bunker fuel from Bergen Bunkers, which then ordered from OWB USA.[44] On October 21, 2014, OWB USA entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the Jo Ilex.[45] On October 30, 2014, NuStar Services delivered the bunker fuel to the Jo Ilex.[46] On November 4, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[47]

### 11. The "Oste" – Alleged Claim for $197,045.68

The Oste ordered bunker fuel from OWB USA, and on October 28, 2014, OWB USA entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the

---

[40] *Id.* at ¶ 68.
[41] *Id.*; *see id.* at Ex. SF-17.
[42] *Id.* at ¶ 68.
[43] *Id.* at ¶ 59; *see id.* at Ex. SF-18.
[44] *Id.* at ¶ 71.
[45] *Id.*; *see id.* at Ex. SF-19.
[46] *Id.* at ¶ 71.
[47] *Id.* at ¶ 72; *see id.* at Ex. SF-20.

Oste.[48]  On October 30, 2014, NuStar Services delivered the bunker fuel to the Oste.[49]  On

November 4, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB

USA, allowing OWB USA to confirm that delivery was as ordered.[50]

### 12. *The "Umgeni" – Alleged Claim for $53,432.70*[51]

The Umgeni ordered bunker fuel from OWB USA, and on October 23, 2014, OWB USA

entered into a contract with NuStar Services to have NuStar Services deliver bunker fuel to the

Umgeni.[52]  On October 27, 2014, NuStar Services delivered the bunker fuel to the Umgeni.[53]  On

October 30, 2014, NuStar Services sent an invoice and the Marine Fuel Delivery Note to OWB

USA, allowing OWB USA to confirm that delivery was as ordered.[54]

### 13. *The "LNG Finima" – Alleged Claim for $2,456,997.27*[55]

The LNG Finima ordered bunker fuel from OW Germany, which then ordered from

OWB USA.[56]  On October 24, 2014, OWB USA entered into a contract with NuStar Terminals

to have NuStar Terminals deliver bunker fuel to the LNG Finima.[57]  On October 31 and

November 1, 2014, NuStar Terminals delivered the bunker fuel to the LNG Finima.[58]  On

---

[48] *Id.* at ¶ 74; *see id.* at Ex. SF-21.

[49] *Id.* at ¶ 74.

[50] *Id.* at ¶ 75; *see id.* at Ex. SF-22.

[51] The OWB USA Trust objects to NuStar's alleged administrative expense claim for the Umgeni because an order previously entered regarding the parties' settlement of this transaction, which provided NuStar with $53,432.70.  *See* OWB USA MSJ, 36; Amended Order Granting the Debtors' Motion Seeking Approval of Settlement Agreement with NuStar Supply and Trading LLC, NuStar Energy Services, Inc., and NuStar Terminals Marine Services N.V. NuStar included the claim for the Umgeni to prevent any future challenge to the funds NuStar received.  NuStar Opposition to OWB USA, 38-9.

[52] *Id.* at ¶ 77; *see id.* at Ex. SF-23.

[53] *Id.* at ¶ 77.

[54] *Id.* at ¶ 78; *see id.* at Ex. SF-24.

[55] The NuStar-OWB USA Stipulation states that the price of fuel delivered to the LNG Finima was $53,432.70 (¶ K), but that is the same price of the fuel delivered to the Umgeni.  The invoice between OWB USA and NuStar Terminal for the fuel delivered to the LNG Finima is listed as $2,456,997.27, which is why that figure is listed above. *See* NuStar-OWB USA Stipulation, Ex. SF-33.

[56] *Id.* at ¶ 80.

[57] *Id.*; *see id.* at Exs. SF-31 and SF-32.

[58] *Id.* at ¶ 80.

November 10, 2014, NuStar Terminals sent an invoice and the Marine Fuel Delivery Note to OWB USA, allowing OWB USA to confirm that delivery was as ordered.[59]

### III.  Discussion

#### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) is made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056.  Rule 56 directs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  "Upon consideration of a motion for summary judgment, 'the judge's function . . . is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Parris v. Delaney (In re Delaney)*, 504 B.R. 738, 746 (Bankr. D. Conn. 2014) (quoting *Anderson*, 477 U.S. at 249).  "[T]he court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Mex. Constr. & Paving v. Thompson (In re Thompson)*, 511 B.R. 20, 24 (Bankr. D. Conn. 2014) (quoting *Flaherty v. Lang*, 199 F.3d 607, 615 (2d Cir. 1999)).

At the summary judgment stage, the moving party must show there are no material issues of fact, and the court must consider all facts in the light most favorable to the non-moving party when making this determination.  *Conn. Ironworkers Emp'rs Ass'n v. New England Reg'l Council of Carpenters*, 869 F.3d 92, 98–99 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1547 (2018)

---

[59] *Id.* at ¶ 81; *see id.* at Ex. SF-33 and SF 34.

(citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456, (1992); *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015)).  Once the moving party has met its burden, the "party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  *Official Comm. of Unsecured Creditors of Affinity Health Care Mgmt., Inc. v. Wellner (In re Affinity Health Care Mgmt., Inc.)*, 499 B.R. 246, 251 (Bankr. D. Conn. 2013) (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)).

### B.  "Received by the Debtor" under 11 U.S.C. § 503(b)(9)

An administrative expense claim arises out of a transaction between a creditor and a debtor, and "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor[] in the operation of the business."  *Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (internal quotation marks omitted).  "Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed," and the party requesting an administrative expense has the burden of proving its entitlement to it.  *Supplee v Bethlehem Steel Corp.*, (*In re Bethlehem Steel Corp.*), 479 F.3d 167, 172 (2d Cir. 2007) (internal quotation marks omitted).

A review of the existing case law, including the law relied upon by the parties, demonstrates that determining whether the bunker fuel was "received by the debtor" is complicated.  As the parties acknowledge, the term "received" is not defined in the Bankruptcy Code.  Courts have looked to the Uniform Commercial Code (the "UCC") and the interpretation of "receipt" with respect to reclamation rights recognized in section 546(c) of the Bankruptcy Code, to define "receipt" under section 503(b)(9).  Therefore, to determine whether OWB USA "received" the goods as a matter of law, several provisions of the UCC, case law concerning the

11

meaning of "received by the debtor" in section 503(b)(9), and the contracts between the OW Bunker Group and the Vessels must be analyzed.

### 1. **The Uniform Commercial Code**

The UCC defines "receipt" with respect to goods as "taking physical possession of them." UCC § 2-103(1)(c). Despite what appears to be a clear definition of "receipt," courts have been asked to address what constitutes "possession." Comment 2 to § 2-103 expands on the definition of "receipt" by explaining that

> **'Receipt' must be distinguished from delivery** particularly in regard to the problems arising out of shipment of goods, whether or not the contract calls for making delivery by way of documents of title, since the seller may frequently fulfill his obligations to 'deliver' even though the buyer may never 'receive' the goods. Delivery with respect to documents of title is defined in Article 1 and requires transfer of physical delivery. . . . Otherwise the many divergent incidents of delivery are handled incident by incident.

*Id.* at cmt. 2 (emphasis added).

UCC § 2-702 describes a seller's remedies upon discovering a buyer's insolvency. The seller's remedies include refusing delivery except for cash payment or, when the seller discovers the buyer received the goods on credit while insolvent, the seller can reclaim the goods upon demand made within ten days of receipt. Complimenting UCC § 2-702 is § 2-705, which provides four circumstances where a seller is no longer able to stop goods in transit after the buyer has taken possession, and which expand the definition of "receipt." *See also Montello Oil Corp. v. Marin Motor Oil, Inc. (In re Marin Motor Oil, Inc.)*, 740 F.2d 220, 223-26 (3d Cir. 1984) (hereinafter "*Marin*"). Two of the circumstances where a seller no longer has a right or the ability to stop the shipment of goods in transit are relevant to the discussion here:

> (a) receipt of the goods by the buyer; or
> (b) acknowledgment to the buyer by any bailee of the goods except a carrier that the bailee holds the goods for the buyer . . . .

12

UCC § 2-705. Sub-section (a) is the only circumstance that relies on actual, physical possession, while sub-section (b) provides a circumstance where a seller can no longer stop goods in transit because the buyer has constructive possession. *See id.* The Official Comment to § 2-705 expands the definition of "receipt by the buyer," to include,

> receipt by the buyer's designated representative, the sub-purchaser, when shipment is made direct to him and the buyer himself never receives the goods. It is entirely proper under this Article that the seller, by making such direct shipment to the sub-purchaser, be regarded as acquiescing in the latter's purchase and is thus barred from stoppage of the goods as against him. As between the buyer and the seller, the latter's right to stop the goods at any time until they reach the place of final delivery is recognized by this section.

*Id.* at cmt. 2. These provisions of the UCC permit "receipt" by a buyer that does not require physical possession. *See* UCC § 2-705(b). According to the UCC, although receipt means "taking physical possession," it also allows the person taking physical possession to be either the buyer or the buyer's bailee, designated representative, or sub-purchaser. UCC § 2-705 at cmt. 2.

## 2. **Case Law**

Because "receipt" or "received" is not defined in the Bankruptcy Code, the Court relies not only on the provisions of the UCC, but also on case law in which other courts have interpreted the meaning of these terms under section 503(b)(9). Several courts have acknowledged that the UCC provides that "receipt" requires possession, and there are two kinds of possession: (i) actual, physical possession; and (ii) constructive possession.

"Possession may be actual or constructive, and occurs when the seller can no longer stop delivery and is left only with the remedy of reclamation." *In re ADI Liquidation, Inc.*, 572 B.R. 543, 548 (Bankr. D. Del. 2017); *see also In re World Imports, Ltd.*, 862 F.3d 338, 346 (3d Cir. 2017) ("receipt as used in 11 U.S.C. § 503(b)(9) requires physical possession by the buyer or his agent."); *Marin*, 740 F.2d at 224-25 (holding that "receipt" under 11 U.S.C. § 546(c) has the

same meaning as "receipt" in the U.C.C.); *In re Momenta, Inc.*, 455 B.R. 353, 359 (Bankr. D.N.H. 2011) (hereinafter "*Momenta I*") (holding "the term 'received' in § 546(c) is the equivalent of 'received' in the U.C.C., and the term 'received' in § 503(b)(9) shall be interpreted identically."); *Ningbo Chenglu Paper Prod. Mfg. Co. v. Momenta, Inc.*, No. 11-CV-479-SM, 2012 WL 3765171, at *6 (D.N.H. Aug. 29, 2012) (hereinafter "*Momenta II*") ("[T]he phrase 'received by the debtor' as used in Section 503(b)(9) means: possessed by the debtor, either actually or constructively. . . . [and] under Section 503(b)(9), delivery to, or possession by, a debtor's customer under a drop-shipment arrangement does not constitute constructive possession by the debtor for Section 503(b)(9) purposes.").

The case law on "receipt" has evolved over time, and decisions relevant to this case have been issued before and after the enactment of section 503(b)(9). The facts and holdings of the relevant cases are addressed in detail below.

### *Marin*

The United States Court of Appeals for the Third Circuit decision in *Marin* began the evolution of the definition of "receipt" and "received" under specific sections of the Bankruptcy Code.[60] *See* 740 F.2d 220. Although *Marin* predates BAPCPA and section 503(b)(9), it has been relied upon by several courts analyzing administrative expense claims under section 503(b)(9). In *Marin*, the court addressed the meaning of "receipt" in the context of section

---

[60] *Marin* is distinguished by *In re Best Buy Drugs Inc.*, 89 B.R. 997, 997-98 (Bankr. S.D. Fla 1988) (the issue was "what definition of insolvency applies in order for a plaintiff to succeed in a reclamation proceeding under 11 U.S.C. § 546(c)," and the court found the plaintiff's reliance on *Marin* mistaken because the definition of insolvency was not discussed) and *Old Republic Ins. Co. v. United States*, 625 F. Supp 983, 985 (Ct. Int'l Trade 1986) (a surety filed an action contesting the United States Customs Services' classification of merchandise that entered the United States, and the court found that *Marin*, along with another case the defendant cited in support of its contention "that a bald demand for payment is sufficient in the absence of a requirement that a demand be particularized" was inapposite because the cases did not deal with analogous situations).

546(c), which acknowledges the right of a seller to reclaim goods under certain circumstances. *See id.*

The debtor, Marin, had arranged for a commercial barge operated by a common carrier to pick up the gasoline it was purchasing from the creditor, transport the gasoline to a terminal where Marin had storage rights, and unload the gasoline into the storage facility. *Id.* at 222. The creditor was not involved in transporting the gasoline. *Id.* The *Marin* court discussed the Bankruptcy Code's adoption of "the seller's right of reclamation created by section 2-702 of the [U.C.C.], which enables a seller to reclaim its goods upon demand made within ten days after receipt of the goods by the buyer." *Id.* at 221 (internal quotation marks omitted). The court addressed two questions, only one of which is relevant to this discussion: whether Marin received the goods in question in order to start the ten-day period running for the purpose of reclamation. *Id.*

The court delved into the legislative history of section 546(c) to determine whether and to what extent the right to reclamation was preempted by the Bankruptcy Code. The court found that the drafters of the Bankruptcy Code "essentially [] adopt[ed] 2-702(2) as part of the federal bankruptcy law. . . ." *Id.* at 223. The court then turned to the question of what constituted "receipt" of goods. Marin argued that it took possession of the goods when they were loaded onto the common carrier because that was when title and risk of loss passed to it, which put receipt of the goods outside of the ten-day period for reclamation. *Id.* at 225. The court found that Marin's argument ignored "the fact that the U.C.C. does not rely on the concept of "title for the purposes of establishing rights of buyers and sellers" and ignored "U.C.C. § 2-705, which views goods given by a seller to a common carrier . . . as being in the possession of the common

15

carrier not the buyer, and gives the seller the right to stop delivery of the goods upon discovery of the buyer's insolvency." *Id.*

The court then noted that the right to stop goods in transit applies regardless of who has "title," and the separate right of reclamation does not take effect until the buyer "receives the goods." *Id.* While the gasoline was in the physical possession of the common carrier, the court held that Marin did not have possession of it – physical or otherwise, and the creditor's remedy upon discovering Marin was insolvent would have been to order the common carrier to stop delivery of the goods. *Id.* However, "[o]nce the gasoline was delivered to Marin's bailee, i.e., [the storage facility], Marin had constructive possession under § 2-705(2) and [the creditor's] right to stop delivery terminated and its right to reclaim the goods under U.C.C. § 2-702(2) arose." *Id.* at 225-26. The *Marin* discussion of when receipt occurs is relevant here because section 503(b)(9) provides an alternative remedy to reclamation under section 546(c) when, for instance, reclamation is impossible.

### In re Circuit City Stores, Inc.

*In re Circuit City Stores, Inc.*, 432 B.R. 225 (Bankr. E.D. Va. 2010) (hereinafter "*Circuit City II*") was one of the first post-BAPCPA cases in which a court was asked to interpret "receipt" under section 503(b)(9). Circuit City Stores, Inc. and its related entities (collectively, "Circuit City"), was a national retailer of consumer electronics. 432 B.R. at 227. Circuit City sold goods in its stores that were obtained on consignment from third party suppliers. *Id.* One supplier, Panasonic Corporation of North America ("Panasonic"), sold goods on consignment to Circuit City before Circuit City filed the jointly administered Chapter 11 cases. *Id.* Circuit City came into physical possession of the goods more than twenty days before the commencement of the Chapter 11 cases. *Id.* Although Circuit City was in physical possession of the goods more

16

than 20 days before their cases were commenced, Panasonic filed a request for an administrative expense claim under section 503(b)(9), arguing that the goods should be deemed to be received by Circuit City on the date that title to the goods passed from Panasonic to Circuit City. *Id.* at 226. Circuit City objected to Panasonic's claim and argued that the goods were received on the date Circuit City took physical possession of them. *Id.*

In analyzing the term "received," the court determined that is was appropriate to "adopt and apply a federal definition for the term 'received' for purposes of section 503(b)(9) . . . ." *Id.* at 228. The court then noted that while the UCC does not define "received," it does define "receipt" of goods as "taking physical possession of them." *Id.* The court determined that because "receipt" and "received" are similar words that concern related issues, they should be treated as functionally identical. *Id.* at 229; *see also In re Circuit City Stores, Inc.*, 416 B.R. 531, 536 (Bankr. E.D. Va. 2009) (hereinafter "*Circuit City I*") (concluding that the term "goods" in § 503(b)(9) should have the same meaning as "goods" as defined in § 546(c)). The court held that, for purposes of section 503(b)(9), "received" means having physical possession of the goods, and because Circuit City was in physical possession of the goods more than twenty days before the commencement of the Chapter 11 cases, Panasonic was not entitled to an administrative expense claim. *Circuit City II*, 432 B.R. at 230.

## *Momenta I*

*Momenta I* was another case decided after BAPCPA to address "receipt" in connection with a section 503(b)(9) claim. *See* 455 B.R. 353. The bankruptcy court was tasked with determining "whether [the creditor, Ningbo] should be allowed an administrative expense claim pursuant to § 503(b)(9) because the Debtor received goods from Ningbo within twenty days of the bankruptcy petition." Id. at 355. Ningbo had delivered goods in six orders to the debtor or

its customers in the twenty days prior to the bankruptcy petition. *Id.* at 355-56. Two of the orders were delivered to the debtor's warehouse, but there was no record of what happened to the four other orders, such as whether they were placed in a warehouse, held by a customs agent, delivered to a common carrier, or held by a bailee (the court classified these four orders as the "Drop Shipments"). *Id.* at 356.

The *Momenta I* court set out to determine whether the Drop Shipments were "received by the debtor" in the context of section 503(b)(9), and relied on its connection to section 546(c) to make that determination. *Id.* The court found the direct link between section 503(b)(9) and section 546(c) informative because section 503(b)(9) serves as an alternative remedy to reclamation for a seller, and case law prior to the enactment of section 503(b)(9) granted sellers administrative expense claims as an alternative to the right of reclamation. *Id.* at 357. The court noted that section 546(c) incorporated Article 2's right of reclamation when the Bankruptcy Code drafters "essentially adopted U.C.C. § 2-702(2) by enacting § 546(c), but with modifications." *Id.* at 358. In defining "received," the *Momenta I* court agreed with the analysis in *Circuit City II,* that "received" and "receipt" as defined in the UCC "are similar words, concern related issues, and should be treated as functional equivalents and interpreted identically." *Momenta I*, 455 B.R. at 358.

The *Momenta I* court then addressed the issue of whether receipt by the debtor can only be accomplished when the debtor is in physical possession of the goods. *Id.* at 359. Like OWB USA, the debtor in *Momenta I* argued that because it never took physical possession of the Drop Shipments, the goods were never "received by the debtor." *Id.* The court analyzed the relationship between UCC sections 2-702 and 2-705 and the Third Circuit's reasoning in *Marin*, and held that "[a] seller must be entitled to an administrative expense claim where a debtor

18

received goods, by having either physical possession or constructive possession as specified in U.C.C. § 2-705(2) . . . ." *Id.* at 360. *Momenta I* therefore found that under the UCC, possession may be physical possession or constructive possession. *Id.* Although the court ultimately held that the record failed to establish whether the debtor had any physical or constructive possession of the Drop Shipments, *id.* at 361, the court stated that constructive possession of goods could be deemed to be "receipt by the debtor" for purposes of § 503(b)(9). *See id.* at 359.

### *Momenta II*

The United States District Court for the District of New Hampshire affirmed *Momenta I* in *Momenta II*. 2012 WL 3765171 at *7. The district court agreed with the bankruptcy court that "changes made to the Bankruptcy Code in 2005 suggest an intent to create a priority administrative expense as a supplemental remedy *for reclamation sellers,* and not . . . a priority remedy for all sellers who deliver goods pursuant to a contract with the debtor and within twenty days preceding bankruptcy." *Id.* (emphasis in original). In its holding, the district court stated that the "bankruptcy court correctly concluded that Sections 503(b)(9) and 546 are related statutory provisions enacted for the benefit of reclamation sellers." *Id.* at *6. It also affirmed the bankruptcy court's determination that the word "received" in sections 503(b)(9) and 546 mean the same thing. *Id.*

### *In re ADI Liquidation, Inc.*

In the *ADI Liquidation* case, the United States Bankruptcy Court for the District of Delaware was asked to determine whether the debtor constructively "received" goods under section 503(b)(9) when the goods were delivered to a third party. 572 B.R. 543. The debtor in *ADI Liquidation* distributed food and retail services to buyers who ordered directly from the manufacturer but paid the debtor for the goods and services. *Id.* The manufacturer delivered the

goods directly to the buyers, and the debtor remitted payment to the manufacturer after deducting a percentage of the invoice amount charged to the buyers. *Id.*

In assessing whether the goods were "received by the debtor" under section 503(b)(9), the *ADI Liquidation* court asked, "[s]hould the definition of constructive receipt be expanded to include deliveries to non-bailee third parties when the debtor is substantially involved in facilitating transactions between a third party and the vendor?" *Id.* at 549. The court held that it "should not," noting that other courts "have held that an arrangement whereby goods are delivered directly to a non-debtor, **non-bailee**, third party does not give rise to constructive possession and, therefore, there can be no valid administrative priority claim under section 503(b)(9)." *Id.* (emphasis added).

### *In re World Imports, Ltd.*

The *World Imports* case was decided shortly after *ADI Liquidation*. In *World Imports*, the United States Court of Appeals for the Third Circuit relied on its 1984 decision in *Marin* and held that "receipt" in section 503(b)(9) requires physical possession of the goods by buyer or its agent. 862 F.3d at 346. The creditors in *World Imports* shipped goods via common carrier from China to the debtor in the United States. *Id.* at 340. The parties agreed that the goods were shipped and in the physical possession of the common carrier more than twenty days before the bankruptcy filing. *Id.* at 341. The parties also agreed that the debtor took physical possession of the goods within the twenty day period. *Id.* The parties disagreed over whether the debtor "received" the goods under section 503(b)(9) when the goods were placed on the common carrier or when the goods were delivered to the debtor within the twenty day period. *Id.* The bankruptcy and district courts held that the common carrier was an agent of the debtor and therefore the debtor constructively received the goods when the common carrier took

physical possession of the goods. *Id.* Because the common carrier took physical possession of the goods more than twenty days before the bankruptcy case was filed, the bankruptcy and district courts held that the creditors were not entitled to an administrative expense claim under section 503(b)(9). *See id.*

In overruling the bankruptcy and district courts, the Third Circuit held that once the seller delivered goods to the common carrier, the "receipt of the goods by a common carrier is not deemed constructive possession by a buyer, but rather is deemed to be possession by the common carrier." *Id.* at 346 (internal quotation marks omitted). The court confirmed its finding in *Marin* that "delivery and receipt of goods can occur at different times," while also stating that the "U.C.C. does not rely on the concept of 'title' for purposes of establishing the rights of buyers and sellers under the Code." *Id.* at 345. Based on this analysis, the Third Circuit ultimately held that "received" in section 503(b)(9), like the *Marin* definition of "receipt" in section 546(c), requires physical possession by the buyer or his agent. *Id.* at 345-46.

### *In re SRC Liquidation, LLC*

Three days after the *World Imports* decision, the United States Bankruptcy Court for the District of Delaware addressed the issue of receipt under section 503(b)(9). *In re SRC Liquidation, LLC*, 573 B.R. 537 (Bankr. D. Del. 2017). In *SRC Liquidation*, the parties stipulated that the creditor delivered the goods in question to UPS for shipping to a third party customer of the debtor via the debtor's account during the twenty day period before the debtor's bankruptcy case was filed. *Id.* at 540. However, the parties disagreed as to whether those goods when delivered to the customer were "received by the debtor." *Id.* The court held that a common carrier like UPS does not qualify as an agent, and goods that are shipped directly to the debtor's customer by its supplier using a common carrier were never physically possessed by the

debtor or its agent. *Id*. at 542 (citing *World Imports,* 862 F.3d at 345). Based upon the holding

that common carrier was not an agent of the debtor, the court denied the creditor's request for an

administrative expense claim. *See id.* at 542.

### 3.  Analysis

The cases discussed above did not directly address the issue of "received" under section

503(b)(9) when a buyer's bailee is in physical possession of the goods. However, the decisions

are relevant to determine whether OWB USA "received the goods" in this case.

The *Marin* court's definition of "receipt" in section 546(c), its determination that section

546(c)'s adoption of UCC § 2-702(2) preserves the right of reclamation, and its finding that a

bailee of the debtor taking possession of goods gives rise to the right of reclamation are

applicable to the issues in this case. *See* 740 F.2d at 225-26. The reasoning in *Marin* and the

relationship between sections 546 and 503(b)(9) can be applied to the situation here: A bailee of

the debtor/buyer (the Vessels) had physical possession of the goods (the bunker fuel) and was

entitled to use the goods for propulsion of the Vessel (which each Vessel did). The seller of the

goods (NuStar) was no longer able to reclaim the goods because each Vessel used the bunker

fuel for propulsion. As noted by several courts, the situation presented in this case is what the

drafters of BAPCPA envisioned when they amended section 546(c)(2) and enacted section

503(b)(9) to enhance certain type of reclamation claims. *See, e.g.*, *Circuit City I*, 416 B.R. at

536; *Circuit City II*, 432 B.R. at 229.

Furthermore, post-BAPCPA courts have looked to *Marin* to conclude that "receipt"

means the same thing in both sections 503(b)(9) and 546(c). *See World Imports*, 862 F.3d at

342-33; *Momenta II*, 2012 WL 3765171 at *5-6; *SRC Liquidation*, 573 B.R. at 541; *ADI

Liquidation*, 572 B.R. at 548; *Momenta I*, 455 B.R. at 358; *Circuit City II*, 432 B.R. at 229;

*Circuit City I*, 416 B.R. at 536-37. In addition, in *Momenta I*, the court found that the term

"receives" includes the three forms of constructive possession set forth in U.C.C. §2-705(2). 455

B.R. at 359-60. In the most recent cases that address the issue of receipt, *ADI Liquidation and*

*World Imports*, the courts acknowledged that constructive possession by the debtor occurs when

the goods are delivered to a bailee of the debtor. *ADI Liquidation*, 572 B.R. at 549; *World*

*Imports*, 862 F.3d at 345.

These cases answer the first part of the question raised by the parties; "received by the

debtor" in section 503(b)(9) is either: (i) physical possession of the goods by the debtor; or (ii)

constructive possession, when a bailee or an agent of the debtor physically possesses the goods.

The second part of the question as to whether goods were "received by the debtor" turns on the

Vessels' contractual relationships with the OW Bunker Group. In accordance with the OW

Bunker Group Terms, each of the Vessels possessed the bunkers solely as a bailee of the OW

Bunker Group, which includes OWB USA. Because the relationships between the OW Bunker

Group and the Vessels cannot be ignored, NuStar's administrative expense claim is allowed in

part.

    a.  **The goods portions of the NuStar claims are allowed administrative**
        **expense claims because each Vessel is a bailee of OWB USA**

The OW Bunker Group Terms applied to each of the agreements between the OW

Bunker Group and the Vessels purchasing bunker fuel from the OW Bunker Group (including

either an affiliated O.W. Bunker entity or the Vessel Interests).[61] The OW Bunker Group Terms

define "Seller" as "OWB [the International O.W. Bunker Group]; any office, branch office,

affiliate or associate of the OWB Group; being the legal entity within the OWB Group, whose

name is included in the Order Confirmation sent to the Buyer." OW Bunker Group Terms ¶ B.1.

---

[61] NuStar-OWB USA Stipulation ¶ 12.

23

The definition of Seller includes OWB USA, as well as OW Germany, OW Far East, OW Swiss, and OW UK.

The OW Bunker Group Terms define "Buyer" as:

the vessel supplied and jointly and severally her Master, Owners, Managers/Operators, Disponent Owners, Time Charterers, Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers, quotations, orders and subsequent agreements or contracts have been made. . . .

*Id.* The definition of "Buyer" includes the Vessels and Vessel Interests described above.

The OW Bunker Group Terms further state:

Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the ***Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller***, ***and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel***, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

*Id.* at ¶ H.2 (emphasis added). However, the OW Bunker Group Terms do not define "Bailee."

Despite any arguments to the contrary, the Court finds that the Vessels are bailees of OWB USA based on the plain language of the OW Bunker Group Terms. Whether one applies English law, which governs the OW Bunker Group Terms, the definition contained in standard legal dictionaries, or the definition contained in the UCC, the meaning of "bailee" is consistent with its use in the OW Bunker Group Terms.

The United Kingdom Supply of Goods and Services Act defines "bailee" in relation to a relevant contract for the hire of goods as "(depending on the context) a person to whom the goods are bailed under the contract, or a person to whom they are to be so bailed, or a person to whom the rights under the contract of either of those persons have passed." Supply of Goods and Services Act 1982, c. 29 Pt III § 18 (UK). The English definition of "bailee" found in *A Dictionary of Law* directs the reader to "bailment," which provides:

24

> **bailment** *n.*  The transfer of the possession of goods by the owner (the **bailor)** to another (the **bailee)** for a particular purpose.  Examples of bailments are the hiring of goods, the loan of goods, the pledge of goods, and the delivery of goods for carriage, safe custody, or repair.  Ownership of the goods remains in the bailor, who has the right to demand their return or direct their disposal at the end of the period (if any) fixed for the bailment or (if no period is fixed) at will.  This right will, however, be qualified by any *lien the bailee may have over the goods.  Bailment exists independently of contract.  But if the bailor receives payment for the bailment (a **bailment for reward)** there is often an express contract setting out the rights and obligations of the parties.  A bailment for which the bailor receives no reward (e.g. the loan of a book to a friend) is called a gratuitous bailment.

*Bailment*, A Dictionary of Law (Jonathan Law ed., Oxford Univ. Press 9th ed. 2018).

Similarly, *Black's Law Dictionary* defines bailee as "1. Someone who receives personal property from another, and has possession of but not title to the property. . . . 2. Someone who by warehouse receipt, bill of lading, or other document of title acknowledges possession of goods and contracts to deliver them."  *Bailee*, Black's Law Dictionary (11th ed. 2019).  A bailment is "1.  A delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose, usu. under an express or implied-in-fact contract.  Unlike a sale or gift of personal property, a bailment involves a change in possession but not in title."  *Bailment*, Black's Law Dictionary (11th ed. 2019).  "Bailee" is defined in the UCC as "a person that by a warehouse receipt, bill of lading, or other document of title acknowledges possession of goods and contracts to deliver them."  UCC § 7-102(a)(1).  Consistently, these definitions of "bailee" refer to a person who takes possession of goods while ownership and title remain with the bailor.

Both parties also rely on the United Kingdom Supreme Court case *PST Energy 7 Shipping LLC v OW Bunker Malta Ltd.*, [2016] 2 C.L.C. 1 (the "*Res Cogitans*" decision), in support of their respective positions.  In *Res Cogitans*, the United Kingdom Supreme Court (the "UK Supreme Court"), held that the contract outlined in the OW Bunker Group Terms was one

25

of sale under the Sale of Goods Act, finding that the vessel at issue could have "no possible defence" [sic] to the OW Bunker entity's claim for the price of the fuel purchased.[62]  *Id.*, at 18. The UK Supreme Court discussed in detail the bailment provision of the OW Bunker Group Terms in rendering its decision.  In determining whether the agreement was a contract of sale, the UK Supreme Court noted that paragraphs H.1 and H.2 of the OW Bunker Group Terms demonstrate the contract's "special features": first, by

> expressly provid[ing] not only for the retention of title pending payment, but also expressly that, until such payment, the 'Buyer' is to be in possession of the bunkers '***solely as Bailee for the Seller***'.  After going on to provide that the Buyer 'shall not be entitled to use the bunkers', the terms introduce the qualification 'other than for the propulsion of the Vessel'.

*Id*. at 13-14 (emphasis added).  According to the UK Supreme Court,

> The qualification clearly reflects a reality.  Bunker suppliers know that bunkers are for use.  If they grant relatively long credit periods combined with a reservation of title pending payment in full, it is unsurprising that they do so combined with an express qualification authorising [sic] use in propulsion, since standard terms prohibiting any use would be uncommercial or in practice, no doubt, simply ignored.

*Id.* at 14.

The UK Supreme Court found that these features "together with an admissible modicum of commercial awareness on the court's part about how ships operate . . . demonstrate that the liberty to use the bunkers for propulsion prior to payment is a vital and essential feature of the bunker supply business."  *Id.*  The contract between the OW Bunker Group entity and the vessel's owners was therefore not a "straightforward agreement to transfer the property in the bunkers to the Owners for a price," because it also permitted consumption of the bunkers "prior

---

[62] The *Res Cogitans* holding is consistent with the decisions in four courts of appeal in the United States that an OW Bunker Group entity, or its assignee, is the party entitled to a maritime lien over a Vessel, and a party such as NuStar is not.  *See, e.g.*, *Bunker Holdings Ltd. v. Yang Ming Liberia Corp.*, 16-35539 (9th Cir. Oct. 11, 2018); *Valero Marketing & Supply Co. v. M/V Almi Sun*, 893 F.3d 290 (5th Cir. 2018); *ING Bank N.V. v. M/V Temara*, 892 F.3d 511 (2d Cir. 2018); and *Barcliff, LLC v. M/V Deep Blue*, 876 F.3d 1063 (11th Cir. 2017).

to any payment and (once the theory of a nanosecond transfer of property is, rightly, rejected) without any property ever passing in the bunkers consumed." *Id.* The OW Bunker Group Terms' bailment structure was vital to the UK Supreme Court's analysis and, in the view of the Court, cannot be disregarded.

The *Res Cogitans* decision and the virtually identical definitions of "bailee" from various sources demonstrate that the use of the term "bailee" in the OW Bunker Group Terms fits squarely within the common understanding of that word. The Vessels, as *bailees*, take possession but not title to the bunker fuel, but are permitted to consume the fuel for the *sole* purpose of propulsion. The *Res Cogitans* decision confirms that title to the bunker fuel does not transfer to the Vessels before payment, and because it is likely the fuel will be consumed before payment is made, transfer of title never occurs and the Vessels remain "bailees." *See Res Cogitans* at 14. The UK Supreme Court even hypothesized that if a circumstance arose where the bunker fuel had not been wholly consumed by the time payment was been made, only *then* would the title to the bunker fuel transfer to the vessel and the bailment would end. *Id.* Regardless of the issue of transfer of title, which does not bear on the meaning of "receipt" under section 503(b)(9), *see, e.g.*, *Marin*, 740 F.2d at 225, the Vessels are bailees of OWB USA.

OWB USA bought bunker fuel from NuStar, and NuStar delivered it to the Vessels. OWB USA was in constructive possession of the bunker fuel when the Vessels, as OWB USA's bailees, took physical possession of the bunker fuel. Because the Vessels were permitted to use the bunker fuel for propulsion, which they did, NuStar could not reclaim the bunker fuel. No genuine issue of material fact exists as to whether OWB USA received the bunker fuel for purposes of section 503(b)(9). Therefore, NuStar is entitled, as a matter of law, to an allowed administrative expense claim for the value of the bunker fuel under the specific facts and

circumstances of this case. *See, e.g.*, 11 U.S.C § 546(c)(2); *Momenta II*, 2012 WL 3765171 at

*4-5; *Momenta I*, 455 B.R. at 356.

> ### b. The non-goods portions of the NuStar claims are not an allowed priority administrative expense claim

While the parties agree that the bunker fuel constituted "goods" pursuant to section

503(b)(9), they dispute whether the miscellaneous charges and fees, including harbor fees,

security fees, wharfage fees, and barging fees (collectively, the "non-goods"), also qualify as

"goods". The OWB USA Trust argues that NuStar should not be granted a priority

administrative claim for the miscellaneous charges, taxes, and non-goods shown on the Vessel

Invoices and the LNG Finima Invoice.[63] NuStar argues that these fees are less than 2% of the

total, *de minimis* and subject to the rule of law that dictates that so long as the predominant

purpose of the goods or services provided qualify for priority under section 503(b)(9), so do the

*de minimis* claims attached to such claims.[64]

A claim for administrative priority treatment must be for "goods." *In re Pilgrim's Pride

Corp.*, 421 B.R. 231, 235 (Bankr. N.D. Tex. 2009).[65] Like "received," the word "goods" is not

defined in the Bankruptcy Code, and courts have therefore looked to the UCC for its definition.

*Id.* at 236. Specifically, courts have looked to UCC § 2-105, which states, "'[g]oods' means all

things (including specially manufactured goods) which are movable at the time of identification

to the contract for sale other than the money in which the price is to be paid, investment

securities (Article 8) and things in action." *Id.* at 237; *see also, e.g.*, *In re Goody's Family

Clothing Inc.*, 401 B.R. 131, 134 (Bankr. D. Del. 2009).

---

[63] NuStar-OWB USA Stipulation, ¶ 18.
[64] *Id.*
[65] Other courts have declined to follow the decision reached in *Pilgrim's Pride* on the issue of whether electricity was a good. *See, e.g.*, *In re NE Opco, Inc.*, 501 B.R. 233, 241-57 (Bankr. D. Del. 2013) (discussing the circuit split over whether electricity is a good, and finding that it is not).

Courts have struggled to apply Article 2 of the UCC to a contract involving a mixture of the supply of goods and provision of services, but many courts have adopted the "predominant purpose" test where, if a "contract is principally directed toward the sale of goods, [the definition of U.C.C. § 2-105] applies; if to the provision of services, it does not." *Pilgrim's Pride*, 421 B.R. at 237; *see also Circuit City I*, 416 B.R. at 538. The court in *Pilgrim's Pride*, however, did not limit the meaning of section 503(b)(9) to exclude goods delivered pursuant to a contract primarily regarding the provision of services. 421 B.R. at 237.

In *Pilgrim's Pride*, the court found administrative expense claims for natural gas to be properly identified as "goods," and the providers were entitled to administrative claims for "the *value* of the gas" delivered. *Id.* at 241 (emphasis in original). The court noted, however, "that the *value* of the gas is just that: Gas Providers are entitled to payment as an administrative expense for the value of gas delivered within 20 days of Debtors' filing, not to any recompense for the use of the utility's infrastructure in delivering the gas." *Id.* The court similarly held that a claim for water delivered also qualified as "goods," but the "claim is limited to the *value* of the water delivered. *Id.* at 242; *see also Goody's Family Clothing*, 401 B.R. at 136 (the court agreed with a prior ruling wherein the value of received goods was limited to the goods themselves and did not include any incidental value of the goods).

Other courts have found the predominant purpose test unnecessary because nothing in section 503(b)(9) "dictates the use of a 'winner take all' approach." *In re Plastech Engineered Prods., Inc.*, 397 B.R. 828, 837 (Bankr. E.D. Mich. 2008); *but see Circuit City I*, 416 B.R. at 538 (specifically disagreeing with the "winner take all" approach). According to the court in *Plastech*, the predominant purpose test only applies when there is a mixture of goods and services *and* there is a need to "categorize[] the transaction as *either* a sale of goods or not." 397

29

B.R. at 837 (referring to instances under non-bankruptcy law where courts must make that determination in figuring out whether a particular body of law applies, and a "winner take all" approach is logical and necessary).  But, the court continued:

> there is nothing in § 503(b)(9) that requires that approach for the purposes of that section of the Bankruptcy Code.  If a particular transaction provides for *both* a sale of goods and a sale of services, and the value of each of them can be ascertained, why shouldn't the value of the goods be entitled to the § 503(b)(9) administrative expense priority and the value of the services be relegated to an unsecured non-priority claim?  There may well be sound policy reasons for not distinguishing between the sale of goods and the sale of services to a debtor within 20 days before bankruptcy, but that is just what § 503(b)(9) does.

*Id.*  The court found the only relevant determination is the "value of the 'goods' that were delivered, irrespective of whether the contract also called for the delivery and sale of services."

The contract here was clearly for the sale of bunker fuel, which the parties agree qualify as "goods" pursuant to section 503(b)(9).  However, like in *Pilgrim's Pride* and *Plastech*, this Court finds that even when the predominant purpose is for the sale of goods, that still does not merit classifying incidental services as goods.  Only the *value* of the *goods* is an administrative expense.  *See, e.g.*, *Pilgrim's Pride*, 421 B.R. at 242-43; *Goody's Family Clothing*, 401 B.R. at 136; *Plastech*, 397 B.R. at 837.  Therefore, the non-goods portion of NuStar Services' ($203,937.19) and NuStar Terminals' ($2,650.00) administrative expense claims that do not apply to the value of the bunker fuel do not qualify as goods for the purposes of 503(b)(9) and must be reclassified as allowed general unsecured claims.

## IV.    Conclusion

Having considered the Motions for Summary Judgment, the accompanying stipulations of fact, existing case law, and the record in this case, the Court holds that for the purposes of § 503(b)(9):  (i) "received by the debtor" means actual or constructive possession of the goods, including physical possession of the goods by a bailee or agent of the debtor; (ii) the Vessels are

the bailees of OWB USA; (iii) OWB USA was in constructive possession of the bunkers when they were delivered to the Vessels and therefore OWB USA "received" the bunkers; and (iv) the "goods" refer only to the bunker fuel and not the incidental costs of delivery. Accordingly, it is hereby

**ORDERED:** NuStar's MSJ is **GRANTED** as to the issue of whether OWB USA "received the goods" pursuant to § 503(b)(9) and **DENIED** as to the issue of whether the non-goods portion of the administrative expense claims qualify as "goods;" and it is further

**ORDERED:** NuStar Services is allowed an administrative expense claim in the amount of $6,476,246.17 and NuStar Terminals is allowed an administrative expense claim in the amount of $2,456,997.27; and it is further

**ORDERED:** The non-goods portion of NuStar Services' and NuStar Terminals' asserted administrative expense claims, $203,937.19 and $2,650.00 respectively, are disallowed as administrative expenses claims and reclassified as allowed general unsecured claims; and it is further

**ORDERED:** The OWB USA MSJ is **DENIED** as to the issue of whether OWB USA "received the goods" pursuant to § 503(b)(9) and **GRANTED** as to the issue of whether the non-goods portion of the administrative expense claims qualify as "goods."

Dated at Bridgeport, Connecticut this 19th day of August, 2019.

*Julie A. Manning*
*Chief United States Bankruptcy Judge*
*District of Connecticut*